IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THERON T. VINSON, individually and as Executrix of the Estate of KERRY D. VINSON; and LINDA G. VINSON, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:19CV313 |
| ARMSTRONG INTERNATIONAL, INC. *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiffs Linda G. Vinson and Theron T. Vinson, individually and as Executrix of the Estate of Kerry D. Vinson, initiated this lawsuit against twenty-eight Defendants in 2019 seeking compensatory and punitive damages relating to Mr. Kerry Vinson's diagnosis of mesothelioma. (ECF No. 1.) In their operative Second Amended Complaint, they allege that Mr. Vinson was exposed to asbestos-containing materials, products, and equipment throughout his thirty-seven-year career at Fiber Industries in Salisbury, North Carolina, and that this exposure in the course of his employment resulted in his diagnosis and subsequent death. (ECF No. 133 ¶¶ 50–53.)

Before the Court are motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure filed by three of the remaining Defendants, Fisher Controls International LLC ("Fisher"), Covil Corporation ("Covil"), and ViacomCBS Inc., successor-

in-interest to Westinghouse Electric Corporation ("Westinghouse"). (ECF Nos. 202 (Fisher); 229 (Covil); 233 (Westinghouse).) Additionally, Plaintiffs have filed for summary judgment against Covil and Daniel International Corporation ("Daniel"). (ECF Nos. 226 (Daniel); 230 (Covil).) For the reasons set forth below, the Court grants each of Defendants' motions for summary judgment and denies each of Plaintiffs' motions for summary judgment.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). That means that a court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts" even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the

nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324. Where, as in this case, the Court has before it cross-motions for summary judgment, the Court reviews each motion separately to determine if either party is entitled to judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## II. DISCUSSION

To prevail in an asbestos-related product-liability action under North Carolina law,[1] a plaintiff must establish that he was "actually exposed to the alleged offending products." *See Wilder v. Amatex Corp.*, 336 S.E.2d 66, 68 (N.C. 1985). Consistent with that requirement, the Fourth Circuit has further held that a North Carolina asbestos plaintiff "'must prove more than a casual or minimum contact with the product' containing asbestos in order to hold the manufacturer of that product liable." *See Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 716 & n.2 (4th Cir. 1995) (quoting *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th

---

[1] As a federal court sitting in diversity, this Court is bound to apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "In tort actions, North Carolina courts adhere to the rule of lex loci and apply the substantive laws of the state in which the injuries were sustained." *Johnson v. Holiday Inn of Am.*, 895 F. Supp. 97, 98 (M.D.N.C. 1995); *Boudreau v. Baughman*, 368 S.E.2d 849, 854 (N.C. 1988) ("This Court has consistently adhered to the lex loci rule in tort actions."). Mr. Vinson's alleged exposure to Defendants' products occurred in North Carolina, as did the diagnosis of his mesothelioma. Accordingly, the Court will apply North Carolina's substantive law.

3

Cir. 1986), and applying its threshold causation standard to a North Carolina case). Instead, to support a reasonable inference of substantial causation from circumstantial evidence, a plaintiff must introduce "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Id.* (quotations omitted). Federal courts have long used this "frequency, regularity, and proximity" test—the "*Lohrmann* test"—to evaluate proximate causation in asbestos cases arising under North Carolina law. *See, e.g.*, *Prekler v. Owens-Corning Fiberglas Corp.*, 60 F.3d 824 (4th Cir. 1995); *Jones v. Owens-Corning Fiberglas Corp. & Amchem Prods., Inc.*, 69 F.3d 712 (4th Cir. 1995).

In *Lohrmann*, the Fourth Circuit held that plaintiffs did not meet their burden when they introduced testimony that the afflicted employee had been exposed to an asbestos-containing product "on ten to fifteen occasions of between one and eight hours during the term of his employment." 782 F.2d at 1163. It also found that evidence showing an employer's purchase of asbestos-containing materials was insufficient when "there was no evidence to show when or where these products were used." *Id.* When a plaintiff is unable to testify as to their actual exposure, they may rely on other witnesses to place them in the "same limited area" as the asbestos for the requisite frequency and regularity. *Roehling v. Nat'l Gympsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1227–29 (4th Cir. 1986). Yet "mere proof that the plaintiff and a certain asbestos product are at [a workplace] at the same time, without more, does not prove exposure to that product." *Lohrmann*, 782 F.2d at 1162 (holding that the presence of asbestos at a workplace as large as a shipyard would not obviate a plaintiff's need to demonstrate a more proximate connection).

4

This notion of "close proximity" was explored in more depth in *Roehling*. There, the Fourth Circuit affirmed summary judgment for the defendants when the plaintiff "could not identify the asbestos products to which he was exposed" and the testimony of three witnesses failed to cure this deficiency when "none of the three ever knew [the plaintiff], or remembered having contact with [him], or could identify [him] as being present on any of the jobs, or knew when, where or what product [plaintiff] had been exposed to." *Roehling*, 786 F.2d at 1226. Such evidence, the court held, "creates only a possibility" that the plaintiff was exposed to asbestos introduced by defendants and "clearly fails to place [plaintiff] in close proximity to identifiable asbestos products." *Id.* at 1226 n.3. On the other hand, the court found that there was a genuine dispute of material fact on another claim in the same case when the plaintiff and his witnesses "were not only in the same plant, but also in the same area, at the construction site of the new boilers, and thus breathed the same air, which was filled with defendants' products' dust." *Id.* at 1228–29.

Plaintiffs point out that the disease at issue in *Lohrmann* was asbestosis and not, as here, mesothelioma. (*E.g.*, ECF No. 255 at 10–13.) Citing a number of non-binding cases, they argue that the bar to demonstrate asbestos exposure under *Lohrmann* should be meaningfully lower given that mesothelioma, unlike asbestosis, "can develop after only minor exposures to asbestos fibers."[2] (*Id.* at 12 (quoting *Linster v. Allied Signal*, 21 A.3d 220, 228–29 (Pa. Super. Ct. 2011).) Since the filing of the parties' briefs, the Fourth Circuit has addressed this

---

[2] Plaintiffs have presented expert testimony in this case that "there is no safe level of exposure" to asbestos for a large population. (ECF No. 255-8 at 33.) That said, Plaintiff's expert acknowledges that "there are some exposures to asbestos that are so brief, of such low air concentration, or otherwise of such trivial nature that they cannot reasonably be held on a probability basis to have contributed to a mesothelioma or lung cancer in a specific individual." (*Id.* at 37–38.) One example of this would be an exposure to "the extremely low amounts of asbestos in ambient air" which "cannot reasonably be considered the cause" of mesothelioma. (*Id.* at 38.)

5

distinction with regards to how it affects jury instructions, stating in dicta that "an evidentiary instruction on asbestosis theoretically requires proof of greater exposure than mesothelioma." *Finch v. Covil Corp.*, 972 F.3d 507, 514 n.2 (4th Cir. 2020). That said—and more pertinent to the motions currently at issue—the court held that the *Lohrmann* standard nevertheless applied in a mesothelioma case arising under North Carolina law. *Id.* This is in accord with federal courts that have routinely reached the same conclusion. *See, e.g.*, *Haislip v. Owens-Corning Fiberglas Corp.*, 86 F.3d 1150 (table), 1996 WL 273686, at *2 (4th Cir. May 23, 1996) (per curiam); *Finch v. BASF Catalysts LLC*, No. 1:16-CV-1077, 2018 WL 4101828, at *4 (M.D.N.C. Aug. 22, 2018); *Starnes v. A.O. Smith Corp.*, No. 1:12-CV-360-MR-DLH, 2014 WL 4744782, at *3 (W.D.N.C. Sept. 23, 2014); *Jandreau v. Alfa Laval USA, Inc.*, No. 2:09-91859-ER, 2012 WL 2913776, at *1 n.1 (E.D. Pa. May 1, 2012). In other words, even if a mesothelioma action requires less frequent and regular interactions with asbestos-containing materials than would an asbestosis action, this does not eliminate the need to demonstrate that actual exposure occurred frequently, regularly, and in close proximity to the plaintiff.

Here, Plaintiffs generally allege that each of the Defendants "manufactured, sold, and/or distributed asbestos-containing products or raw asbestos materials" that were present in Fiber Industries facilities over the course of Mr. Vinson's employment. (ECF No. 133 ¶¶ 19, 51–53.) On the other hand, Defendants largely contend that, even if these allegations are true, Plaintiffs have not produced sufficient evidence that Mr. Vinson was actually exposed to the products or materials at issue nor have Plaintiffs demonstrated that any alleged exposure satisfies *Lohrmann*'s "frequency, regularity, and proximity" test. (*See* ECF Nos. 203 at 10; 231

6

at 3; 234 at 15–17; 248 at 18–20.) Because the relevant evidence varies between Defendants, the Court will address each of the summary judgment motions separately.

### A. Fisher Controls International LLC

It is uncontested that Mr. Vinson worked at the Fiber Industries plant in Salisbury for nearly four decades. (ECF No. 255 at 1.) During that time, Plaintiffs allege that he worked for several years as a maintenance mechanic where "his frequent tasks included the removal and replacement of asbestos gaskets in valves, pumps, and other equipment," including valves manufactured by Defendant Fisher.[3] (*Id.*) Mr. Vinson stated that this work created dust which he inhaled on an almost daily basis. (ECF No. 255-1 at 8–9.)

Despite these assertions, however, Plaintiffs are not able to show that Mr. Vinson had any actual exposure to asbestos-containing products for which Fisher is responsible. Though Mr. Vinson asserts that Fisher valves were present at Fiber Industries, (ECF No. 255-2 at 33), Plaintiffs point to no statement in which Mr. Vinson asserts that the specific Fisher valves he worked with contained asbestos. (*See* ECF No. 255.) Plaintiffs attempt to overcome this lack of evidence by suggesting that asbestos packing was "standard" for Fisher valves during this time period, (ECF No. 255 at 4 (citing ECF No. 255-3 at 37)), suggesting that any Fisher valve at Fiber Industries almost certainly would have contained asbestos. However, the deposition that Plaintiffs cite for this conclusion also makes clear that there were "other options beyond asbestos-containing" products for customers to purchase and that it was up to the "users of

---

[3] At one point in his testimony, Mr. Vinson stated that he had worked with "Fisher pumps" in addition to the company's valves. (ECF No. 255-1 at 8.) However, Defendant Fisher offers uncontroverted testimony that it did not make, sell, or supply any pumps as a part of its business, (ECF No. 203-5 at 23), and Plaintiffs subsequently focused their Response to Fisher's motion for summary judgment on valves alone, (*see* ECF No. 255 at 1).

7

these types of equipment" to decide what types of valves they wanted from the variety of options Fisher made available. (ECF No. 255-3 at 37 (noting that customers would select "the pressure of the valve, the material of the valve, [and] the interior trim parts and things like packing material").) Defendant has produced uncontested testimony that "Fisher valves were uniquely engineered products specific to each customer's request" and that "non-asbestos containing Teflon packing was the most commonly used packing in Fisher valves" during the time period at issue. (ECF No. 203-5 at 2–3.) While it is undisputed that some Fisher valves did contain asbestos, Mr. Vinson was unable to recall the model number of "any Fisher product at the plant," (ECF No. 255-2 at 33), and therefore could not establish that his work with Fisher valves exposed him to asbestos.

Even if Plaintiffs could demonstrate actual exposure, they fail to show that any such exposure happened with the "frequency, regularity, and proximity" required under *Lohrmann*. Though Mr. Vinson stated that he was in proximity to dust on a regular basis in the course of his work, he acknowledged that there were several different types of valve products from different manufacturers in the plant at any one time and could not identify how many times he had actually worked with a Fisher product. (ECF No 255-2 at 33.) Though it is understandable that Mr. Vinson might have difficulty recalling such details, it is nevertheless the Plaintiffs' burden to demonstrate this connection.

Such evidence, when viewed in the light most favorable to Plaintiffs, fails to produce sufficient evidence from which a reasonable juror could find that Mr. Vinson was actually exposed to asbestos-containing products supplied by Fisher or that he was exposed with the "frequency, regularity, and proximity" to meet Plaintiffs' burden under *Lohrmann*.

8

Accordingly, Fisher is entitled to judgment as a matter of law on all of Plaintiffs' claims against it.

B. Covil Corporation

Plaintiffs next allege that Mr. Vinson was exposed to asbestos-containing insulation that had been supplied to Fiber Industries by Defendant Covil. In addition to supplying the products, Plaintiffs also charge that Covil employees directly installed and maintained the insulation and that this work likewise exposed Mr. Vinson to the product. The Court now considers each of these allegations in turn.

To begin, both parties agree that another Defendant in this case, Daniel, performed maintenance and construction at the facility in question and that it ordered insulation from Covil to complete at least some of those projects. (ECF Nos. 231 at 4; 242 at 3.) Plaintiffs also proffer uncontested testimony that Daniel installed insulation constantly in the Salisbury plant from 1964 to 1979. (ECF No. 232-2 at 9–10.) Yet the parties dispute the degree to which Daniel relied on Covil products and, therefore, the degree to which placing Mr. Vinson in proximity to a Daniel employee at work would be equivalent to placing him in proximity to Covil insulation.

In pressing their argument that Daniel relied heavily on Covil to provide insulation, Plaintiffs point to a deposition from a former Covil employee who stated that "if Daniels did a job, Covil insulated it." (ECF No. 242-10 at 55.) Yet the same witness also acknowledged that Daniel had used other subcontractors when it found more advantageous financial arrangements. (*Id.* at 46–47.) This would comport with additional testimony in the record

9

where a Daniel employee affirmed using at least two other insulation companies in addition to Covil during this period. (ECF No. 242-8 at 28.)

Plaintiffs also point to testimony from a Daniel employee stating that he only ordered thermal insulation from Covil when he worked as a foreman from 1968 to 1979. (ECF No. 232-2 at 32–33.) Yet the same foreman also acknowledged that he was not the only person to order insulation in this timeframe. (*Id.*) Further, it is unclear to what degree the foreman's insulation orders occurred during the time in which Mr. Vinson alleges he was exposed to Covil products. Mr. Vinson testified that he moved into a role at Fiber Industries in "beaming and winding" in the fall of 1968. (ECF No. 231-9 at 4.) He spent two years in that role and testified that the only work completed by Daniel in this new workspace did not involve insulation. (*Id.* at 25.) Mr. Vinson additionally confirmed that during the period from 1970 to 1976 he was not around anyone from Daniel or Covil "installing or removing insulation." (*Id.* at 32.) By 1975, according to the Daniel foreman, Covil was no longer supplying asbestos-containing insulation. (ECF No. 232-2 at 34.)

In *Lohrmann*, the Fourth Circuit held that "the mere proof that the plaintiff and a certain asbestos product are at the [same large facility] at the same time, without more, does not prove exposure to the product." *Lohrmann*, 782 F.2d at 1162. Though Plaintiffs go to great lengths to suggest that Mr. Vinson could not have avoided Covil insulation given how much Daniel purchased "for use at Fiber Industries," (*See* ECF No. 232 at 4), they have not carried their burden of placing Mr. Vinson in the same place as any of these asbestos-containing products. The close proximity of Daniel employees completing this work, on its own, leaves only the general possibility that Covil insulation was likewise present.

10

Plaintiffs next argue that Mr. Vinson worked in close proximity to Covil employees who were installing or maintaining insulation. The parties first dispute whether or not Covil had any employees at the Fiber Industries facility at issue. Though multiple witnesses testify that Covil did not provide any of its staff to work with insulation products at the facility, (*see* ECF Nos. 231-3 at 12; 231-5 at 5), at least one Covil employee did recall subcontract work on air conditioning equipment, (ECF No. 231-6 ¶ 5), and another acknowledged that a Covil employee had been injured when working on scaffolding at Fiber Industries, (ECF No. 232-5 at 43–44). This testimony, however, does not place either worker in proximity to Mr. Vinson.

In order to do that, Plaintiffs rely on Mr. Vinson's testimony that he was "around the Covil workers when they were doing insulation work." (ECF No. 232-1 at 11.) He testifies further that Covil workers were in the plant for "the first two and a half years" of his career and that he saw them insulating "pipes and valves and pumps and everything." (*Id.*) He additionally described in some detail how these employees performed their work and attested that he had "occasion to breathe in the dust" such work created on a daily basis. (*Id.* at 11–14.)

Later in his testimony, however, Mr. Vinson acknowledged that he could not "distinguish a Covil person from a Daniel person." (ECF No. 231-9 at 34.) Though saying it was "possible" that the people he interacted with were from Covil, he admitted that he "can't say that" with certainty, (*id.*), and asserted that the entire basis for this belief were statements made to him by his coworkers.[4] (ECF No. 231-9 at 33.) Plaintiffs' testimony, at best, amounts

---

[4] Though Mr. Vinson identified a list of coworkers who might have provided him with this information, (ECF No. 231-9 at 33), Plaintiffs do not provide any testimony from any source that independently confirms this identification.

11

to hearsay in that such out-of-court statements are offered for their truth. (*See* Fed. R. Evid. 801.) "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n, Inc. v. Maryland.*, 933 F.2d 1246, 1251 (4th Cir. 1991). Therefore, in order to demonstrate that Mr. Vinson had actual exposure to Covil workers, Plaintiffs rely entirely on the testimony of a witness who acknowledged that he could not independently identify them.

Such evidence, when viewed in the light most favorable to Plaintiffs, fails to produce sufficient evidence from which a reasonable juror could find that Mr. Vinson was actually exposed to asbestos-containing insulation supplied, installed, or maintained by Covil or that he was exposed with the "frequency, regularity, and proximity" to meet Plaintiffs' burden under *Lohrmann*. Accordingly, Covil is entitled to judgment as a matter of law on all of Plaintiffs' claims against it.

### C. ViacomCBS Inc.

The Court next considers a motion for summary judgment brought by ViacomCBS Inc., a successor-in-interest to Westinghouse. (ECF No. 233.) Plaintiffs allege that Mr. Vinson was exposed to asbestos in Westinghouse motors during his time as a maintenance mechanic and later in Westinghouse breaker boxes when he worked as an electrician. (ECF No. 261 at 2.)

Mr. Vinson asserted that he worked on motors on a daily basis for an extended period of time, and he identified Westinghouse as one possible manufacturer of those motors. (ECF No. 261-1 at 15–16.) Yet, as Westinghouse points out, Mr. Vinson qualified his statement in the following way:

12

> Q: These motors, do you recall the trade name or manufacturer of the motors that you did this packing work on?
>
> A: I think one of them was Ben–Bensfield or something like that.
>
> Q: Okay. How about some other manufacturers of motors?
>
> A: GE and Westinghouse. But I don't know that they had them.

(*Id.* at 15.) It is unclear in this instance if Mr. Vinson is stating that he was unsure whether Fiber Industries used Westinghouse motors or whether he is communicating that he does not know whether Westinghouse motors contained the asbestos dust he had just described. (*See id.*) Asked in a follow-up question if he had "work[ed] on all those manufactures of motors," Mr. Vinson simply replied "[p]robably." (*Id.*) In cross-examination, this uncertainty became even more clear. When asked whether he could tell counsel, "except for Bensfield, the brand name or manufacturer of the motors you worked on in the shop," Mr. Vinson acknowledged that he could not. (ECF No. 234-2 at 14.) Mr. Vinson additionally was unable to establish that the motors he was working on contained asbestos. After testifying that he believed that the spacers in the motors might contain them, he was clear that he was not certain of this:

> Q: Can you tell me why you think [the spacer] contained asbestos?
>
> A: Just, it could, I guess. I don't know.

(ECF No. 261-3 at 15.) Aside from the spacers, Mr. Vinson additionally admitted that there was not anything about his work rebuilding motors that he believed would have otherwise exposed him to the offending product. (*Id.* at 16.)

Plaintiffs likewise have difficulty showing any exposure from Westinghouse products with regards to Mr. Vinson's work as an electrician. Mr. Vinson testified that he worked with Westinghouse breaker boxes, contact assemblies, and starter boxes. (ECF No. 261 at 5 (citing

13

ECF Nos. 261-1 at 13–14; 261-3 at 23, 32).) Yet, as Defendant Westinghouse points out, "Plaintiffs have made no attempt to prove that the Westinghouse . . . electrical products at Fiber Industries were the type that contained asbestos, and if so, whether Mr. Vinson worked on those particular products." (ECF No. 275 at 7.) Though Plaintiffs point repeatedly to the dust that Mr. Vinson encountered as he completed this work, they do not point to any testimony from Mr. Vinson that identifies this dust as containing asbestos. (*See* ECF No. 261 at 5–6.) Rather, Plaintiffs rely on studies conducted by Westinghouse's expert witness, Dr. William Longo, who tested whether some products produced by Westinghouse would have exposed asbestos dust upon routine maintenance. (*See id.* at 6–10.) Such reliance, however, is misplaced. As Plaintiffs acknowledge, Dr. Longo merely tested "representative" Westinghouse breakers at a later date and did not attempt to demonstrate that the tested products were present at the Fiber Industries facility nor did he show that Mr. Vinson was in the proximity to any of the products he studied. (*Id.* at 6.)

Such evidence, when viewed in the light most favorable to Plaintiffs, fails to produce sufficient evidence from which a reasonable juror could find that Mr. Vinson was actually exposed to asbestos-containing products manufactured by Westinghouse or that he was exposed with the "frequency, regularity, and proximity" to meet Plaintiffs' burden under *Lohrmann*. Accordingly, Westinghouse is entitled to judgment as a matter of law on all of Plaintiffs' claims against it.

### D. Daniel International Corporation

Finally, Plaintiffs have moved for summary judgment against Daniel. (ECF No. 226.) Plaintiffs allege that Mr. Vinson "was regularly around Daniel workers who were installing

14

and/or removing asbestos insulation" at the Fiber Industries facility. (ECF No. 227 at 1.) Indeed, Mr. Vinson's testimony puts him in proximity to such activity on a daily basis for several months at a time, (ECF No 227-1 at 13), and the testimony of other witnesses establishes an ongoing and consistent Daniel presence at the facility for nearly all of Mr. Vinson's career, (ECF No 227 at 2–5). For its part, Defendant does not deny such a relationship with Fiber Industries and acknowledges that "[t]here is no question" Daniel was present as early as the facility's initial construction. (ECF No. 248 at 2, 18.)

Yet Daniel argues that "the record is replete with factual issues" that preclude summary judgment. (*Id.* at 1.) This includes, most simply, whether Daniel exposed Mr. Vinson to asbestos. (*Id.* at 12.) Though Plaintiffs are correct that there is evidence in the record suggesting that Daniel used significant amounts of asbestos-containing insulation, (*see, e.g.*, 227-7 at 6), Daniel "does not concede that testimony describing its workers as simply working with insulation is an exposure to asbestos" because "there are obviously insulation products that do not contain asbestos," (ECF No. 248 at 7 n.5). There is also at least some testimony in which Mr. Vinson acknowledges that non-asbestos insulation was used in the facility, (*see* ECF No. 248-2 at 14–15), though it is unclear if such non-asbestos-containing insulation was installed on the particular lines to which Mr. Vinson was exposed. Further, even if Daniel is responsible for an asbestos exposure that was frequent, regular, and in close proximity to Mr. Vinson, it provides some expert testimony suggesting that this exposure was not substantial enough to cause mesothelioma. (ECF No. 248 at 19–20.)

A court at summary judgment stage is required to take the evidence in the light most favorable to the nonmovant. Here, the Court adopts the nonmovant's version of events that

it is plausible that the Daniel insulation at issue did not contain asbestos and, even if it did, Plaintiffs may not be able to satisfy the frequency, regularity, and proximity test under *Lohrmann* with regards to Mr. Vinson's mesothelioma. This creates a genuine dispute as to a material fact that is best left for a jury. While Daniel argues that there are additional unresolved disputes, the Court need not address those at this time. Accordingly, the Court denies summary judgment to Plaintiffs.

### III. CONCLUSION

Based on the foregoing, the Court concludes that Plaintiffs have failed to meet their burden to provide sufficient evidence of Mr. Vinson's exposure to asbestos-containing products attributable to Defendants Fisher, Covil, and Westinghouse "on a regular basis over some extended period of time in proximity to where [Mr. Brock] actually worked." *See Jones*, 69 F.3d at 716; *Lohrmann*, 782 F.3d at 1162–63. Plaintiffs have thus failed to establish causation as to each of these named Defendants, and, therefore, each is entitled to judgment as a matter of law on all of Plaintiffs' claims against them.

On Plaintiffs' own claim for summary judgment, the Court finds that there are material issues in dispute and therefore Plaintiff has failed to meet its burden for summary judgment as a matter of law on its claims against Daniel.

The resolution of these motions in Defendants' favor additionally resolves several other outstanding motions in this case. First, it renders moot Defendant ViacomCBS's four motions to exclude expert testimony offered by Plaintiffs now that they will no longer be a party in this case upon dismissal. (*See* ECF Nos. 213; 219; 222; 224.) Second, with regards to Plaintiffs' Motion for Summary Judgment Regarding Defendants' Affirmative Defenses, (*see*

16

ECF No. 211), only Defendant Daniel remains a party in this case. In its Response, however, Daniel has conceded the affirmative defenses of contributory negligence, assumption of the risk, and sophisticated user. (ECF No. 257.) Accordingly, the Court grants this uncontested motion as to these affirmative defenses.

For the reasons stated herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that the Motions for Summary Judgment filed by Defendants Fisher Controls International LLC, Covil Corporation, and ViacomCBS Inc., (ECF Nos. 202; 229; 233), are GRANTED. Plaintiffs' claims against each of these Defendants only are hereby DISMISSED.

IT IS FURTHER ORDERED that the Motions for Summary Judgment filed by Plaintiffs against Covil Corporation and Daniel International Corporation, (ECF Nos. 226; 230), are DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment Regarding Defendants' Affirmative Defenses, (ECF No. 211), is GRANTED as to Daniel International Corporation, the only remaining Defendant named in the motion.

IT IS FURTHER ORDERED that Defendant ViacomCBS Inc.'s motions to exclude expert testimony, (ECF Nos. 213; 219; 222; 224), are DISMISSED AS MOOT.

This, the 16th day of February 2021.

/s/ Loretta C. Biggs
United States District Judge